# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

**ANDRE MCRAE,**

    **Plaintiff,**

v.                                                Case No. 5:17-cv-299-Oc-02PRL

**CHARLES LOCKETT, FNU SHIPPEE,
FNU HILL, FNU SIERRA, FNU KLONTZ,
FNU UPCHURCH, FNU ALEJANDRO,
FNU TAYLOR, and MICHAEL PINERO,**

    **Defendants.**
_____/

# **ORDER**

In his second amended complaint, Plaintiff—a federal inmate proceeding pro se—alleges that Defendants violated his rights under the First and Fifth Amendments. Dkt. 21. Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Dkt. 59. Plaintiff has responded. Dkt. 84. Upon consideration, the Court determines that Defendants' motion to dismiss is due to be granted.

# I. BACKGROUND AND ALLEGATIONS OF PLAINTIFF'S COMPLAINT[1]

## A. Plaintiff's Mail is Withheld

At all times relevant to this lawsuit, Plaintiff was incarcerated at United States Penitentiary ("USP") Coleman II. Dkt. 21 at 16.[2] In September 2015, Plaintiff filed a lawsuit against prison officials at USP Tucson, where he had apparently previously been incarcerated. *Id.* at 9. The next month, Defendants Shippee, Hill, Sierra, and Klontz (the "S.I.S. Defendants")[3] began withholding his personal and legal mail. *Id.* Later, they began withholding his subscriptions to magazines and newspapers. *Id.* When Plaintiff asked why his mail was being withheld, Defendants Sierra and Klontz told Plaintiff he was not going to win his pending suit against prison officials. *Id.* at 10-11.

Defendants Upchurch and Alejandro are employed in the mailroom at USP Coleman II. *Id.* at 9. They knew or reasonably should have known that the S.I.S Defendants had neither cause nor justification for seizing Plaintiff's incoming and

---

[1] For purposes of ruling on Defendants' Rule 12(b)(6) motion to dismiss, the Court accepts as true the allegations of Plaintiff and applies the liberal pleading standard for pro se litigants. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[2] References to this document are to the page numbers assigned when the document was filed in CM-ECF.

[3] Plaintiff's second amended complaint states that the "S.I.S. Defendants" began to withhold his mail but does not specify which of the Defendants he considers to be "S.I.S. Defendants." The Court assumes that he is referring to Defendants Shippee, Hill, Sierra, and Klontz because, elsewhere in the second amended complaint, Plaintiff identifies them as being affiliated with the S.I.S. *See* Dkt. 21 at 3-4, 9. "S.I.S." appears to refer to the Special Investigative Services Department. Dkt. 21 at 12; Dkt. 59 at 2.

outgoing legal and personal mail. *Id.* They also knew that the S.I.S. Defendants were not forwarding Plaintiff's mail to him. *Id.* Despite this, they continued to give Plaintiff's mail to the S.I.S. Defendants. *Id.* Defendant Alejandro also began opening Plaintiff's legal mail outside Plaintiff's presence. *Id.*

  B. <u>Plaintiff Complains About Treatment of a Visitor</u>

In February 2016, Tearesa Hunter visited Plaintiff at USP Coleman II. *Id.* at 11. During that visit, Correctional Officer Johnson (who is not a Defendant) copied Ms. Hunter's cellular telephone number from a visitation record maintained by the Bureau of Prisons ("BOP") without permission. *Id.* Officer Johnson then used the information to contact Ms. Hunter on her cell phone. *Id.* During that call, Officer Johnson disparaged Plaintiff and tried to set up a date with Ms. Hunter, who declined Officer Johnson's advances. *Id.*

Plaintiff filed an administrative grievance (BP-9) about the incident and requested that Officer Johnson be reprimanded. *Id.* Plaintiff also complained to Defendant Lockett (who is the warden of USP Coleman II) about Officer Johnson. *Id.* About a week later, Defendant Shippee summoned Plaintiff and threatened to have Plaintiff placed in "SHU/Segregation on Administrative segregation status"[4] if

---

[4] Plaintiff does not explain what the SHU is, but he appears to be referring to a Special Housing Unit created in accordance with 28 C.F.R. §§ 541.20-541.33. "Special Housing Units (SHUs) are housing units in Bureau [of Prisons] institutions where inmates are securely separated from the general inmate population, and may be housed either alone or with other inmates. Special housing units help ensure the safety, security, and orderly operation of correctional facilities, and protect the public, by providing alternative housing assignments for inmates removed from the

3

he did not withdraw the grievance. *Id.* In light of that threat, Plaintiff withdrew the grievance. *Id.* at 12. Plaintiff also complained to Defendant Lockett about Defendant Shippee's threats and being forced to withdraw the grievance. *Id.*

  C. <u>Visitors are Stricken from Plaintiff's Visitor List</u>

In March 2016 and January 2017, the S.I.S. Defendants struck visitors from Plaintiff's approved visitor list—including his fiancée and friends—for no reason. *Id.* at 10. Defendant Pinero then refused to place the stricken visitors back on Plaintiff's visitor list. *Id.*

Specifically, a few weeks after Plaintiff complained to Defendant Lockett about Defendant Shippee's threat to put him in the SHU/Segregation, Viviana Vega came to USP Coleman II to visit Plaintiff. *Id.* at 12. Prison staff refused her entry to the visiting room. *Id.* Previously (in December 2015), prison officials had approved Ms. Vega to visit Plaintiff. *Id.* Ms. Vega had been visiting Plaintiff on a weekly basis without any difficulty. *Id.* Plaintiff complained to Defendant Lockett about Ms. Vega's having been turned away when she attempted to visit Plaintiff. *Id.* Defendant Lockett then told Plaintiff that the S.I.S. Department had recommended that Ms. Vega be removed from Plaintiff's visitor list because she and Plaintiff had

---

general population." 28 C.F.R. § 541.21. An inmate can be placed in the SHU on "administrative detention status" when necessary to ensure the safety, security, and orderly operation of correctional facilities or to protect the public. *Id.* § 521.22(a). An inmate can also be placed in the SHU on "disciplinary segregation status," which is a punitive status imposed by a Discipline Hearing Officer as a sanction for committing prohibited acts. *Id.* § 521.22(b).

4

no relationship prior to his present incarceration.  *Id.*  At that time, Defendant Lockett, S.I.S. Department personnel, and unit manager Defendant Pinero[5] knew or reasonably should have known that the issue of a prior relationship between Plaintiff and Ms. Vega had been "addressed, vetted, and approved" during the visitation application process four or five months earlier.  *Id.*  A week later, Plaintiff learned that Ms. Vega's visitation privileges had been rescinded by Defendants Lockett and Pinero.  *Id.*

Between March and July 2016, Plaintiff filed an administrative grievance (BP-9) at the institutional level concerning Ms. Vega's removal from his visitor list.  *Id.* at 12-13.  When he received no response, he sent a BP-10 to the BOP regional office and a BP-11 to the central office.  *Id.* at 13. He did not receive a response to those complaints, either.  *Id.*  Because he had not received any responses, he again applied to have Ms. Vega placed on his visiting list in July 2016.  *Id.*  Plaintiff and Ms. Vega continued to assert that they had a preexisting relationship, but prison officials—including Defendants Lockett and Pinero—refused to accept their assertions unless they could produce a picture of Plaintiff and Ms. Vega taken together before Plaintiff's incarceration (which began in 2004).  *Id.*

---

[5]Plaintiff sometimes spells this name "Pineiro" and sometimes spells it "Pinero." Defendants spell it as "Pinero," so that is the spelling the Court adopts.

Plaintiff continued to complain about Ms. Vega's removal from his visitor list and the refusal to reinstate her to the list to Defendants Lockett and Pinero throughout July and August 2016. *Id.* About six months later, in February 2017, Defendants Lockett and Pinero caused Plaintiff's fiancée—Ivette Piloto—to be removed from his visitor list. *Id.* Again, they claimed that Plaintiff had no preexisting relationship with Ms. Piloto, a reason that was pretextual. *Id.* Ms. Piloto had been visiting Plaintiff since October 2015, at which time the issue of their preexisting relationship was "addressed, vetted and approved" by Defendants Lockett and Pinero. *Id.* As they did with Ms. Vega, Defendants required Plaintiff to produce a photograph of himself and Ms. Piloto taken prior to his present incarceration (which began in 2004). *Id.*

Defendant Pinero knew or reasonably should have known that he was obligated to put the visitors back on Plaintiff's visitor list because he was the unit manager and had initially approved the stricken visitors. *Id.* at 10. The removal of the visitors from the list and the refusal to place them back on the list was done without cause or justification and was done in retaliation for Plaintiff's filing of the lawsuit against the S.I.S. Department at USP Tucson. *Id.* Plaintiff contends that Defendants Lockett and Pinero knew or reasonably should have known that BOP Program Statements and the Code of Federal Regulations do not require a prisoner to bear the burden of establishing the existence of a preexisting relationship with a prospective visitor by providing a photograph. *Id.* at 14.

### D. Plaintiff is Placed in SHU/Segregation

Defendants also unjustifiably placed and kept Plaintiff in SHU/Segregation from November 22, 2016 to the date of the second amended complaint "for no reason without 'any' Incident Report, or Administrative Lock up order given to him . . . ." *Id.* at 10. According to Defendants Hill and Shippee, Plaintiff was under investigation for "some things," but they never told Plaintiff what those things were. *Id.* Later Defendant Shippee told Plaintiff that Plaintiff was not a "good fit" for USP Coleman II and that Plaintiff was being transferred. *Id.*

### E. Plaintiff Complains to Defendants Lockett and Taylor

Throughout this period, Plaintiff informed Defendant Lockett and Defendant Taylor (who is a captain) of their subordinates' unjustifiable conduct. *Id.* at 10. He also told them that he asked why his mail was being withheld and that Defendants Sierra and Klontz responded by saying that he was not going to win his pending lawsuit against prison officials. *Id.* at 10-11. Defendants Lockett and Taylor flatly refused to take any action to correct their subordinates or to otherwise ensure that Plaintiff received his mail, could visit with his visitors, or be released from SHU/Segregation. *Id.* at 11.

### F. Plaintiff's Second Amended Complaint

Based on these factual allegations, Plaintiff alleges that Defendants violated the First and Fifth Amendments. *Id.* at 7, 15. He sues the various Defendants in their

7

individual capacities only. *Id.* at 5-6. He seeks $100,000 in compensatory damages, $500,000 in punitive damages, costs and fees, and interest. *Id.* at 8.[6]

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). When considering a Rule 12(b)(6) motion, the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted). The Court may dismiss a cause of action when, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *See Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

## III. DISCUSSION

Defendants move to dismiss Plaintiff's claims arguing: (1) Plaintiff's claims are barred by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. §

---

[6] The second amended complaint also seeks injunctive relief and references the declaratory judgment statutes (28 U.S.C. §§ 2201 and 2202). *See* Dkt. 21 at 8. But injunctive and declaratory relief are not available because Plaintiff is no longer incarcerated at USP Coleman II and there is no reason to think he will be confined there again under similar circumstances. *See, e.g.*, Dkt. 43 (noting change of address to USP Terre Haute); Dkt. 66 (noting change of address to USP Lewisburg); Dkt. 67 (discussing impending transfer to USP Lewisburg); Dkt. 82-1 at 3 (showing that Plaintiff is currently assigned to USP Lewisburg). Therefore, any requests for injunctive and declaratory relief are moot. *See Smith v. Allen*, 502 F.3d 1255, 1267 (11th Cir. 2007) (citations omitted) ("The general rule in our circuit is that a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief."), *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277 (2011).

1997e(e); and (2) *Bivens* does not create a damages remedy for Plaintiff's claims. The Court discusses each of these arguments separately.

A.  PLRA Requirement of Physical Injury or Sexual Act

First, the Court concludes that the PLRA bars Plaintiff's claim for compensatory damages to the extent those damages are intended to compensate for mental or emotional injuries and that the PLRA also bars his claims for punitive damages. The PLRA provides, in relevant part: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)." 42 U.S.C. § 1997e(e). Section 1997e(e) applies to claims for compensatory and punitive damages, but it does not apply to claims for nominal damages. *Brooks v. Warden*, 800 F.3d 1295, 1307-08 (11th Cir. 2015). Section 1997e(e) is an affirmative defense, but a district court may dismiss a complaint when "its allegations, on their face, show that an affirmative defense bars recovery on the claim." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003).

Plaintiff was confined at USP Coleman II at the time of the events in the second amended complaint (Dkt. 21 at 9), was confined at USP Coleman II at the time he instituted this action (*id.* at 21), and is currently confined at USP Lewisburg (Dkt. 82-1 at 3; Dkt. 84 at 1 (discussing current incarceration in a lockdown

facility/program at USP Lewisburg)). Thus, he cannot bring a federal civil action for mental or emotional injury[7] without a prior showing of physical injury or the commission of a sexual act. Plaintiff does not, however, allege any physical injuries or predicate sexual acts within the meaning of the PLRA. *See, e.g.*, *Brooks*, 800 F.3d at 1307 (citations omitted) (PLRA requires more than *de minimis* physical injury); 18 U.S.C. § 2246(2) (defining "sexual act" under PLRA). Thus, Plaintiff's claims for punitive damages are barred, and his claims for compensatory damages are barred to the extent they seek recovery for mental or emotional injuries.

   B.     Existence of *Bivens* Remedy

Even if Plaintiff's First and Fifth Amendment claims are not barred by the PLRA (and to the extent that Plaintiff's pro se second amended complaint can be liberally construed as including a request for nominal or actual damages), they are due to be dismissed because the First and Fifth Amendments do not imply a right of action for damages in circumstances such as these. Plaintiff brings claims for monetary damages against Defendants in their individual capacities for violations of the federal Constitution. That is, he is attempting to bring a so-called "*Bivens*" claim.

---

[7] The second amended complaint describes Plaintiff's injuries as follows: "Loss of mail, maintenance of familial relations, retaliation and interference with access to court." Dkt. 21 at 8. In the absence of any claimed physical injury or significant property damage, the Court assumes that Plaintiff's demand for $100,000 in compensatory damages includes damages for mental or emotional injuries.

Dkt. 21 at 4.[8]  In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the United States Supreme Court recognized an implied right of action for damages against federal officers for violations of the Fourth Amendment.  Since that time, however, the Court has extended the *Bivens* remedy in only two other contexts: a Fifth Amendment equal protection claim for sex discrimination in employment and an Eighth Amendment claim against federal prison officials for failure to provide medical treatment.  *See Davis v. Passman*, 442 U.S. 228, 248-49 (1979) (Fifth Amendment); *Carlson v. Green*, 446 U.S. 14, 19-23 (1980) (Eighth Amendment).  The Supreme Court has repeatedly refused to extend the *Bivens* remedy in other contexts, including a claim for violation of the First Amendment.  *See Bush v. Lucas*, 462 U.S. 367, 390 (1983); *see also Rager v. Augustine*, No. 5:15cv35/MW/EMT, 2017 WL 6627416, at *15 (N.D. Fla. Nov. 8, 2017) ("*Rager I*") (collecting cases in which Supreme Court refused to create a *Bivens* remedy), *report and recommendation adopted by* 2017 WL 6627784 (N.D. Fla. Dec. 28, 2017), *aff'd*, 760 F. App'x 947 (11th Cir. 2019) ("*Rager II*").

In *Ziglar v. Abassi*, __ U.S. __, 137 S. Ct. 1843 (2017), the Supreme Court recently clarified how courts should proceed when asked to recognize a *Bivens* remedy.  The Court emphasized that it has consistently refused to extend *Bivens* to

---

[8] Plaintiff's second amended complaint also mentions some other federal statutes.  Dkt. 21 at 8.  Two of them (28 U.S.C. §§ 1361 and 1651) are not relevant.  The third and fourth (28 U.S.C. §§ 2201 and 2202) relate to declaratory judgments, but as discussed, *supra*, any claims for declaratory relief are moot.

11

any new context and that expanding the *Bivens* remedy is "now a 'disfavored' judicial activity." *Id.* at 1857 (internal quotation marks and citation omitted). It explained that expanding the *Bivens* remedy implicates separation-of-powers concerns and that, in most cases, Congress should decide whether to provide a remedy. *Id.* Thus, when confronted with a *Bivens* claim, a court must first ask whether the claim arises in a new *Bivens* context–that is, whether the case is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court. *Id.* at 1859. A case might present a novel *Bivens* context

> because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem . . . to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of other potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.

If the case presents a novel *Bivens* context, the court must determine whether there are "special factors counselling hesitation." *Id.* at 1857 (internal quotation marks and citation omitted). The Supreme Court has not defined the phrase, but the inquiry must concentrate on whether the judiciary is well suited, absent action from Congress, "to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58. To be a "special factor counselling hesitation," a factor "must cause a court to hesitate before answering that question in the affirmative."

12

*Id.* at 1858. If there is an alternative remedial structure, that alone may prevent extending the *Bivens* remedy. *Id.* In general, "if there are sound reasons to think Congress might doubt the efficacy of a damages remedy as part of the system for enforcing the law and correcting a wrong," the courts must refrain from extending the *Bivens* remedy. *Id.* In making this assessment, the court should consider "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself . . . ." *Id.* The court should also consider whether Congress "has designed its regulatory authority in a guarded way, making it less likely that Congress would want the judiciary to interfere." *Id.*

Upon consideration, the Court concludes that Plaintiff's First and Fifth Amendment claims present a new *Bivens* context. The essence of Plaintiff's claims is that Defendants retaliated against him for filing a lawsuit against officials at USP Tucson and then continued retaliating against him when he complained by intercepting his mail, limiting his visitors, and placing him in the SHU. The Supreme Court has never recognized a *Bivens* remedy for violations of the First Amendment. *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."). Moreover, the facts of Plaintiff's claims differ from the unreasonable search and seizure claim at issue in *Bivens*, the gender discrimination claim in *Davis*, and the deliberate medical indifference claim in *Carlson*. Thus, this case presents a new *Bivens* context. *See, e.g.*, *Rager I*, 2017 WL

6627416, at *17 (finding that plaintiff's claim that defendants violated the First Amendment by retaliating against him for filing internal grievances presented a new *Bivens* context), *report and recommendation adopted by* 2017 WL 6622784; *Harris v. Dunbar*, No. 2:17-cv-00536-WTL-DLP, 2018 WL 3574736, at *1-3 (S.D. Ind. July 25, 2018) (finding that plaintiff's First and Fifth Amendment claims for special confinement in the Communications Management Unit and interference with mail present new *Bivens* context).

The next issue is whether special factors counsel hesitation in extending the *Bivens* remedy, including the existence of alternative remedies. Here, it appears that Plaintiff had alternative remedies available to him. Specifically, Plaintiff could have filed a civil rights action seeking injunctive relief enjoining the allegedly unconstitutional conduct. *See Rager I*, 2017 WL 6627416 at *18 (declining to extend *Bivens* remedy for First Amendment retaliation claim in part because plaintiff could have pursued alternative remedy of injunctive relief), *report and recommendation adopted by* 2017 WL 6622784.[1]

---

[1] The Court recognizes that Plaintiff claims that several of his official grievances were ignored and that Defendant Shippee essentially forced him to withdraw another grievance. These facts do not, however, change the conclusion that Plaintiff had alternative remedies available to him. This is because the Eleventh Circuit has held that retaliation or threats of retaliation may make administrative remedies unavailable to an inmate for purposes of exhaustion purposes, thus permitting him to proceed with a civil rights action. *Rager I*, 2017 WL 6627416, at *18, *report and recommendation adopted by* 2017 WL 6622784 (citing *Turner v. Burnside*, 541 F.3d 1077, 1084-85 (11th Cir. 2008); *Bryant v. Rich*, 530 F.3d 1368, 1373 n.6 (11th Cir. 2008)). Likewise, if a prison's

But even if Plaintiff did not have alternative remedies available to him, the Court concludes that other special factors counsel hesitation. First, "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." *Abassi*, 137 S. Ct. at 1865. This case presents such a situation where legislative action suggests that Congress does not want a damages remedy. As noted by the Supreme Court in *Abassi*:

> Some 15 years after *Carlson* [*v. Green*] was decided, Congress passed the [PLRA], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. This Court has said in dicta that the Act's exhaustion requirements would apply to *Bivens* suits. But the Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Id.* (internal citations omitted). While Congress's failure to create a damages remedy is not definitive, the fact remains that Congress has been active in the area of prisoners' rights and has not created a damages remedy. This is enough to "cause [the Court] to hesitate" and cuts against extending the *Bivens* remedy to Plaintiff's case. *See, e.g.*, *Rager I*, 2017 WL 6627416, at *18-19 (refusing to extend *Bivens* remedy to First Amendment retaliation claim in part because PLRA does not provide for standalone damages remedy), *report and recommendation adopted by* 2017 WL

---

grievance system is effectively a "dead end," an inmate is not required to exhaust administrative remedies before filing suit. *See Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1858-60 (2016).

6622784; *Harris*, 2018 WL 3574736, at *3 (refusing to extend *Bivens* remedy to First and Fifth Amendment claims based on interference with mail and confinement to Communications Management Unit in part because PLRA does not provide for standalone damages remedy).

In addition, the particular nature of Plaintiff's claims also counsel hesitation. As noted above, Plaintiff claims that Defendants retaliated against him after he filed a federal lawsuit and continued taking adverse action against him after he complained about the alleged retaliation by interfering with his mail, limiting his visitors, and placing him in the SHU, thereby violating the First and Fifth Amendments.[9] Retaliation claims implicate a defendant's state of mind, which is rarely susceptible of concrete proof. As a result, retaliation claims are "easily fabricated." *Bistrian v. Levi*, 912 F.3d 79, 96 (11th Cir. 2018). By its nature, life in a federal prison can be harsh. Recognizing a *Bivens* remedy for retaliation claims like those in the second amended complaint could lead to the unwanted result of inmates filing lawsuits and

---

[9] In the section of the second amended complaint describing the injuries alleged in the suit, Plaintiff mentions "interference with access to court" as an injury. Dkt. 21 at 8. This conclusory statement is not supported by any facts and need not be accepted by the Court. To the extent this reference to interference with court access constitutes a claim that Plaintiff was deprived of access to the prison's grievance program, such a claim is due to be dismissed for the same reasons as Plaintiff's other claims. In addition, prisoners do not have a constitutionally protected liberty interest in an inmate grievance process. *See, e.g.*, *Dunn v. Martin*, 178 F. App'x 876, 878 (11th Cir. 2006) (cited as persuasive authority); *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) (collecting cases). While prisoners have a constitutional right to seek redress of government grievances, it is the right of access to the courts. *Massey*, 259 F.3d at 647 (citation omitted). And the right of access to the courts was not compromised here because Plaintiff was able to timely file this lawsuit and present his case. *See, e.g.*, *Rager I*, 2017 WL 6627416, at *23, *report and recommendation adopted by* 2017 WL 6627784.

grievances against correctional officers and then claiming that any negative action that followed was a result of retaliatory animus. *Andrews v. Miner*, 301 F. Supp. 3d 1128, 1135 (N.D. Ala. 2017). The costs of such actions would be high. *Id.*; *see also Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (noting that because of "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated," a prisoner's retaliation claim should be evaluated "with skepticism and particular care").

In addition, all of the alleged wrongs in this case implicate classic matters of prison administration—monitoring mail, determining who may visit prisoners, and deciding who should be placed in the SHU. As it relates to a claim of punitive detention in the SHU, the court in *Bistrian* identified another special factor counseling hesitation: "Whether to place an inmate in more restrictive detention involves real-time and often difficult judgment calls about disciplining inmates, maintaining order, and promoting prison officials' safety and security." *Bistrian*, 912 F.3d at 96. A similar logic applies to Plaintiff's claims that Defendants interfered with his mail and improperly restricted his visitors. *See, e.g.*, *Alexander v. Ortiz*, No. 15-6981 (JBS-AMD), 2018 WL 1399302, at *7 (D.N.J. Mar. 20, 2018) (stating, in the context of a putative *Bivens* claim by an inmate-employee, "The Supreme Court has previously stated that 'courts are ill equipped to deal with the increasingly urgent

problems of prison administration and reform . . . . Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government . . . . Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.'" (quoting *Turner v. Safley*, 482 U.S. 78, 84–85 (1987))).

Finally, with respect to Plaintiff's First Amendment claims, the Court notes that, since *Abassi*, the majority of courts have declined to extend the *Bivens* remedy to First Amendment claims like Plaintiff's. *See Atkinson v. Broe*, No. 15-cv-386-WMC, 2019 WL 231754, at *5 (W.D. Wis. Jan. 16, 2019) (collecting cases declining to extend the *Bivens* remedy to First Amendment claims in the prison context); *see also Rager II*, 760 F. App'x at 953 ("[I]t is by no means clear that a damages remedy is warranted for a First Amendment retaliation claim like this one."). On the facts of this case, the Court agrees that it is not appropriate to extend the *Bivens* remedy to Plaintiff's First and Fifth Amendment claims.

In his response, Plaintiff admits that *Abassi* controls this case but disagrees with its analysis.[10] *See generally* Dkt. 84. This Court is, of course, bound by the

---

[10] For example, Plaintiff recognizes that his claims present a new *Bivens* context under the rationale of *Abassi* but suggests that the Court should look to district court and court of appeals decisions when deciding whether a claim presents a new *Bivens* context. Dkt. 84 at 8-9. *Abassi*, however, instructed lower courts to consider whether the case is different in a meaningful way from

18

Supreme Court's decision in *Abassi*, and Plaintiff's claims fail under the analytical framework set forth in *Abassi*. This is a flaw that cannot be remedied by amendment. Thus, Defendants' motion to dismiss those claims is granted.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (Dkt. 59) is granted. Because amendment would be futile, Plaintiff's second amended complaint (Dkt. 21) is dismissed with prejudice. Any pending motions are denied as moot. The Clerk of Court is instructed to close the file.

**DONE AND ORDERED** at Tampa, Florida, on May 30, 2019.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record
Plaintiff, pro se

---

previous *Bivens* cases decided by the Supreme Court. 137 S. Ct. at 1859. The Court may not disregard that direction.